IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| NORTHERN NATURAL GAS COMPANY, a Delaware Corporation,<br><br>Plaintiff,<br><br>v.<br><br>CONEXUS ENERGY, LLC, a Texas Limited Liability Company,<br><br>Defendant. | CASE NO. _____<br><br><br>**COMPLAINT** |

COMES NOW the Plaintiff, Northern Natural Gas Company ("Northern"), and for its Complaint against the Defendant, Conexus Energy, LLC ("Conexus"), states and alleges as follows:

## THE PARTIES

1. Northern is a Delaware corporation with its principal place of business in Omaha, Douglas County, Nebraska. Plaintiff is a "natural gas company" within the meaning of the Natural Gas Act, 15 U.S.C. § 717 *et seq.*, and is engaged in the transportation of natural gas in interstate commerce.

2. Conexus is a Texas limited liability company with its principal place of business in Midland, Texas. Each of Conexus' members is also a citizen of the State of Texas.

## JURISDICTION AND VENUE

3. This Court has diversity jurisdiction under 28 U.S.C. § 1332 because this is a civil action between citizens of different states.

4. For purposes of diversity jurisdiction, Northern is a citizen of the States of Delaware and Nebraska. Conexus and its members are citizens of the State of Texas.

5. The amount in controversy exceeds $75,000.00, exclusive of interest and costs.

6. This Court has personal jurisdiction over Conexus because it has transacted business in the State of Nebraska and has minimum contacts with the State of Nebraska such that it could reasonably expect to be haled into Court in this forum.

7. Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in this District.

## FACTUAL ALLEGATIONS

*Background on Northern*

8. Northern hereby reincorporates the above Paragraphs of its Complaint as though fully set forth herein.

9. Northern operates an approximate 14,600-mile interstate natural gas pipeline system, geographically located from the Permian Basin in Texas to Michigan's Upper Peninsula, including the State of Nebraska.

10. Northern provides, among other things, transportation and storage services for its customers, also known as shippers (hereinafter, "shippers"). In exchange, shippers pay Northern a reservation rate for entitlement to transportation and storage services. Northern's rates are regulated by the Federal Energy Regulatory Commission ("FERC").

11. Northern provides firm and interruptible transportation service for its shippers, which dictates the shippers' priority of entitlement to transport. Primary firm service is the highest priority transportation service on Northern's system. It is scheduled before and has priority over any other type of service on the system.

12. In the normal course of its business, Northern receives "nominations" from shippers during what are known as nomination "cycles" for each gas day in a given month (each day of a given month is referred to as a "Gas Day"), which begins at 9:00 a.m. and ends at 9:00 a.m. the following day.

13. The "nominations" are requests made by shippers to Northern to transport gas on Northern from the desired receipt point to the desired delivery point. Nominations include information such as the requested receipt points on Northern's system, where Northern receives the gas from the shipper (upstream); delivery points on Northern's system, where Northern delivers or returns the gas to the shipper (downstream); the quantity of gas to be transported by Northern; the service type (i.e., firm or interruptible); the party providing the gas to Northern at the receipt point; and the party receiving the gas from Northern at the delivery point.

14. Upon receipt of a nomination, Northern determines whether sufficient capacity exists on Northern to schedule the gas. In the case of primary firm service, which requires a nomination from the contract receipt point to the contract delivery point, Northern preliminarily schedules the nomination. The only situations where Northern does not preliminarily schedule primary firm service is in the case of an outage on Northern's system or in the event of the

failure of the shipper to bring gas into the system (often referred to as receipt point under-performance).

15. Once Northern preliminarily schedules the nominations, Northern confirms with parties operating the receipt and delivery points ("operators") to verify the point operators have the same quantities. If a nominated quantity is confirmed by both Northern and the point operator, the gas is then scheduled for transport from the receipt point to the delivery point. If a nominated quantity is not confirmed by both parties, the lowest confirmed quantity is deemed the scheduled quantity.

16. This process ensures that Northern can successfully perform its natural gas transportation obligations and meet the demand of its customers.

*Firm Service Agreements and Northern's FERC Gas Tariff (the "Tariff")*

17. On or about February 14, 2020, Northern and Conexus entered into a Firm Throughput Service Agreement, amended effective November 1, 2020, which extended the term of the Firm Throughput Service Agreement to March 31, 2021 ("Service Agreement No. 136728").

18. On or about February 2, 2021, Northern and Conexus entered into a "maximum rate" Firm Throughput Service Agreement, for a term of February 3 to February 22, 2021 ("Service Agreement No. 138073").

19. Collectively, Service Agreement Nos. 136728 and 138073 are referred to herein as the "Service Agreements."

20. Under the Service Agreements, Northern agreed to provide Conexus a maximum daily quantity ("MDQ") of reserved capacity for primary firm transportation service of natural gas. Northern agreed to take receipt of gas provided by Conexus at the contracted receipt points and deliver that gas back to Conexus at the contracted delivery points.

21. Northern reserved the capacity for Conexus in an amount consistent with the MDQ set forth in the Service Agreements. In exchange, Conexus agreed to pay Northern reservation charges for the capacity reserved on Northern's system ("Reservation Charges"). The Reservation Charges are owed by Conexus regardless of whether it flows gas under the Service Agreements.

22. The Service Agreements do not obligate Conexus to deliver any specific quantity of gas to Northern. However, if Conexus makes a timely nomination and its gas is confirmed and

scheduled for primary firm service up to the MDQ, Northern is obligated to receive and deliver the natural gas.

23. The Reservation Charges are not based on actual deliveries of natural gas. The Service Agreements contemplate reserved capacity on Northern's system for Conexus' use and the payment of charges therefor.

24. The Service Agreements do not contemplate the purchase or sale of natural gas supplies by Northern for Conexus. The service is expressly limited to Northern's transportation of Conexus' gas supplies.

25. The MDQ contemplated by Service Agreement No. 136728, as amended, under which Northern reserved capacity on its system for the transport of natural gas, is the amount of 50,806 dekatherms ("Dth") per day. The MDQ enables Conexus to transport 50,806 Dth per day on Northern's system and obligates Northern to transport up to 50,806 Dth per day for Conexus.

26. The MDQ contemplated by Service Agreement No. 138073, under which Northern reserved capacity on its system for the transport of natural gas, is the amount of 10,000 Dth per day. As stated, the MDQ enables Conexus to transport 10,000 Dth per day on Northern's system and obligates Northern to transport up to 10,000 Dth per day for Conexus.

27. To reserve the agreed upon capacity on Northern's system, Northern expends significant time and resources to perform services and work in maintaining its facilities to meet demand and receive natural gas throughout a given day. Northern also undertakes significant upkeep and maintenance of the physical pipeline assets, including compression assets, underground storage facilities and LNG facilities, to ensure system reliability and availability of transportation service for its customers.

28. Reservation Charges for the MDQ capacity reserved on Northern's system are calculated using a rate set forth in the operative agreement, as required by FERC.

29. The rate for Reservation Charges agreed to by Conexus and set forth in Service Agreement No. 136728 is an index-based formula rate that was approved by FERC and is calculated based on the index (market) price of natural gas prices, applicable to primary and alternate receipt and delivery points in the Service Agreement, as published in "Platts Gas Daily."

30. Service Agreement No. 13648 is a negotiated rate contract subject to review of and acceptance by FERC. The agreement was filed by Northern and accepted by FERC. The

FERC-accepted terms of the agreement, including the rate provision, appear in Northern's Tariff at Sheet No. 66B.23, footnote 279.

31. Service Agreement No. 138073 is a "maximum rate" agreement, which means that the rate is the maximum rate set forth in the Tariff.

32. The Service Agreements are both subject to, and incorporate in full, Northern's Tariff, which has been approved by FERC. Both parties are bound by the terms of the Tariff and the Service Agreements.

33. Northern's shippers, including Conexus, have historically benefited under index-based agreements, because such agreements allow the shipper to transact on a forward basis with upstream suppliers and downstream markets with index-based prices for all parties.

34. Sections 6, 7, and 10 of the General Terms and Conditions in Northern's Tariff ("GT&C") outline the responsibilities of Northern and its shippers regarding possession of gas and a force majeure event.

35. Section 6 provides that Northern is "deemed" to be in possession of the gas delivered by the shipper from the time the gas is received by Northern until it delivers that gas to the shipper's delivery point. The shipper, in turn, is deemed to be in possession of the gas prior to receipt by Northern and after delivery by Northern. Under this provision, each party is responsible for risk of loss when the gas is in its possession.

36. Section 7 provides that neither Northern nor the Shipper/Purchaser is liable to the other "for its failure to receive and or deliver gas, and the Shipper/Purchaser shall not be liable to Northern for its failure to deliver or receive gas *other than to make payments*, which such failure…shall be due to force majeure as defined in Section 10…[.]" (Emphasis added). Thus, a force majeure event does not excuse payment for reservation or any other charges.

37. Section 10 of the Tariff defines the term "Force Majeure" and states, in pertinent part: "Force Majeure shall not include failure of gas supply because of pricing considerations."

38. Section 22 of the GT&C addresses Force Majeure Events and provides for the potential recovery of "Reservation Charge Credits" by shippers. However, Conexus waived any right to Reservation Charge Credits in Service Agreement No. 136728.

*Weather Conditions in February 2021*

39. Cold weather occurred throughout Northern's entire system from approximately February 12 through February 20, 2021 (the "Weather Event").

5

40. During the Weather Event, cold weather caused disruptions to natural gas availability in certain areas of the United States, thereby reducing the available upstream supply of natural gas to Northern and increasing gas prices throughout the central United States.

41. During the Weather Event, Northern experienced a reduction in receipts of natural gas from shippers, operators and interconnecting pipelines (the "Upstream Circumstances").

42. In response to the Upstream Circumstances, Northern acted quickly and efficiently to ensure physical pipeline operations were maintained. Northern sent field technicians to physically monitor system operations to ensure compression assets continued to perform and monitored receipt and delivery points continuously. Northern was prepared to take necessary action to maintain the reliability of its system.

43. Northern's actions maintained an operationally viable balance on Northern's pipeline system, despite the Upstream Circumstances.

44. During the Weather Event, Northern's pipeline system remained fully operational. Northern did not experience any system outages. Northern's system was capable of transporting additional volumes of natural gas if received from shippers.

45. During the Weather Event, Northern continued to reserve capacity for Conexus and other shippers for their use if the shipper nominated the use of the capacity.

46. During the Weather Event, multiple shippers, including Conexus, reduced deliveries and/or failed to make deliveries of natural gas supplies to Northern, for various reasons, despite the fact that Northern maintained firm capacity on its system and could have transported natural gas delivered into its system.

47. During the Weather Event, some shippers, including Conexus did not make deliveries of natural gas supplies to Northern and instead, for economic reasons, chose to deliver quantities to *other* natural gas transportation pipelines, despite the fact that Northern maintained firm capacity on its system and could have transported the gas.

48. Because Northern was experiencing significantly reduced gas receipts into its system, Northern posted a force majeure notice to alert shippers to potential action by Northern outside of normal NAESB[1] Gas Day nomination and scheduling cycles in response to reduced

---

[1] Under Chapter 18 of the Code of Federal Regulations, Part 284.12, Northern is authorized to transport natural gas and required to comply with the business practices and standards promulgated by North American Energy Standards Board ("NAESB").

gas receipts. Northern did not take any action after posting the force majeure notice and did not, nor does it intend to, rely upon such force majeure notice to avoid performing under its Service Agreements, as Northern was capable of doing so throughout the Weather Event. Northern later withdrew the force majeure notice when it became clear Northern would not be required to take additional action.

49. For the Gas Days February 13 through February 16 during the Weather Event, Conexus did not make nominations on Northern to use Conexus' contracted capacity.

50. In response to the Weather Event, Conexus provided notice of a "force majeure" event, claiming the circumstances prevented Conexus from delivering gas to Northern and disclaiming liability for Reservation Charges owed to Northern.

51. There was no force majeure event on Northern's system, and Northern's system remained fully operational during the Weather Event. Northern transported and delivered all shippers' gas it received during the entirety of the Weather Event.

52. Regardless of the Upstream Circumstances that caused and/or contributed to a reduction in supply of natural gas, Conexus is required under the Service Agreement and the Tariff to pay for the capacity that was reserved on Northern's system during the Weather Event. Even if Conexus was unable to utilize the capacity reserved under the Service Agreements due to its claimed Force Majeure, Section 7 of the GT&C requires payment for Reservation Charges.

***Unpaid Reservation Charges.***

53. On or about March 1, 2021, Northern issued an invoice to Conexus for Reservation Charges incurred from February 1 through 28, 2021, calculated pursuant to the respective Service Agreements, in the amount of $7,296,930.46 under Service Agreement No. 136728, and $280,818.14 under Service Agreement No. 138073, for a total amount of $7,577,748.60 (the "Reservation Charge Invoice").

54. Conexus disputed Reservation Charges set forth in the Reservation Charge Invoice for Gas Days February 14 and 15, 2021, in the total amount of $3,564,608.28.

55. On or about March 10, 2021, Conexus paid Northern $4,013,140,32 of the Reservation Charge Invoice, leaving a balance due to Northern of ***$3,564,608.28*** (the "Outstanding Amount Due").

56. Conexus has refused to pay the Outstanding Amount Due to Northern on the basis that cold weather occurring during the Weather Event constituted an Force Majeure event that prevented Conexus from delivering gas supplies to Northern.

57. Northern, however, remained ready to provide service on the primary firm obligation during the Weather Event, as required by the Service Agreements. Northern substantially performed its obligations under the Service Agreements.

58. Regardless of any Force Majeure events, the Service Agreements and the Tariff require Conexus to make payment to Northern for all Reservation Charges incurred in February 2021.

59. Market fluctuations do not impact Conexus' obligation to pay the Reservation Charges. Section 10 of the Tariff states that such pricing considerations shall not constitute a Force Majeure event.

60. Conexus refuses to pay Northern in full for Reservation Charges as required by the Service Agreements and the Tariff.

*Choice of Law and Jury Trial Waiver*

61. The Service Agreements must be construed in accordance with Nebraska law. Section 13 of the Tariff states, "all matters of construction and interpretation of the service agreement shall be interpreted, construed, and governed by the laws of the State of Nebraska."

62. Additionally, the Service Agreements explicitly state that each party has waived its right to a trial by jury with respect to litigation directly or indirectly arising out of, under, or in connection with the Service Agreement.

## COUNT I:
## BREACH OF CONTRACT CLAIM

63. Northern hereby reincorporates the above paragraphs as though fully set forth herein.

64. The Reservation Charge Invoice was fully due and payable by Conexus no later than March 11, 2021.

65. To date, Conexus has failed or otherwise refused to pay the total Outstanding Amount Due that is owed to Northern for Reservation Charges under the Service Agreements and the Tariff and has wrongfully withheld payment to Northern.

66. Northern has satisfied all enforceable conditions precedent under the Service Agreements to furnish and make available natural gas transportation services, on a primary firm basis, to Conexus.

67. Conexus has breached the Service Agreements by failing to pay Northern for the total Reservation Charges due.

68. Conexus has further breached the Service Agreements by acting in a manner inconsistent and directly against the purposes and the express and/or implied terms of the Service Agreements.

69. As a direct and proximate result of Conexus' breach, Northern has incurred damages of at least $3,564,608.28, plus charges, interest and other incidental and consequential damages in an amount to be proven at trial.

WHEREFORE, Northern prays for Judgment against Conexus on Count I in the amount of at least $3,564,608.28, plus charges, interest and consequential and incidental damages; prejudgment and post-judgment interest thereon at the highest legal rate; the costs of this lawsuit; attorney fees; and for such further relief as the Court deems just and equitable.

## COUNT II:
## DECLARATORY JUDGMENT

70. Northern hereby reincorporates the above paragraphs as though fully set forth herein.

71. A real and active controversy exists between the parties based on the allegations set forth in this Complaint, and the controversy is susceptible to immediate resolution and judicial enforcement by this Court pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 et seq.

72. The plain and unambiguous language of the Service Agreements require Conexus to pay Northern for Reservation Charges.

73. The Service Agreements set forth the reservation rates required for payment of Reservation Charges by Conexus to Northern, as accepted by FERC.

74. The plain and unambiguous language of the Tariff requires Conexus to pay Reservation Charges regardless of any force majeure event.

75. Conexus has refused to pay Northern as required by the Service Agreements and Tariff.

WHEREFORE, Northern prays for a declaration and Order by this Court that the Service Agreements are valid and enforceable, and Conexus is obligated to make payments for Reservation Charges under the Service Agreements and Tariff, despite any force majeure events declared or occurring.

### REQUEST FOR RELIEF

WHEREFORE, Northern respectfully requests this Court issue a Judgment in favor of Northern and against Conexus on each Count of this Complaint, and order the following relief:

A) damages in an amount of no less than $3,564,608.28;

B) for its costs of this lawsuit;

C) for its attorney fees as allowed by law;

D) for charges, interest, and consequential and incidental damages;

E) for prejudgment and post-judgment interest as allowed by law, including but not limited to Neb. Rev. Stat. §§ 45-103 through 45-104;

F) for a declaration that the Service Agreements are valid and enforceable and that a force majeure event does not relieve Conexus of its obligation to make payments under the Service Agreements or Tariff, as requested herein; and

G) for all other and further relief that the Court deems just and proper.

DATED this 25th day of March 2021.

NORTHERN NATURAL GAS COMPANY,
Plaintiff

By: /s/ Patrick S. Cooper
Stephen M. Bruckner, #17073
Patrick S. Cooper, #22399
Katherine A. McNamara, #25142
FRASER STRYKER PC LLO
500 Energy Plaza
409 South 17th Street
Omaha, Nebraska 68102-2663
(402) 341-6000
sbruckner@fraserstryker.com
pcooper@fraserstryker.com
kmcnamara@fraserstryker.com

and

Kirk Lavengood, #26699
JoAnna DeWald, #24828
Northern Natural Gas Company
1111 S. 103rd Street
Omaha, NE 68124
kirk.lavengood@nngco.com
joanna.dewald@nngco.com
ATTORNEYS FOR PLAINTIFF